IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1396-06






THE STATE OF TEXAS



v.



NANCY N. NEESLEY, Appellee





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FIRST COURT OF APPEALS


HARRIS COUNTY





 Johnson, J., filed a dissenting opinion.


D I S S E N T I N G O P I N I O N 



 The state has challenged the decision of the court of appeals to affirm the trial court's suppression
of the results of two blood tests. The trial court held an extended hearing and received evidence from six
witnesses. It then suppressed the blood-test results, the first pursuant to Rules of Evidence 104, 702, and
705, and the second pursuant to Transportation Code § 724.012(b). The court of appeals affirmed. The
state now appeals to this Court, asking that we interpret the term "a specimen" as written in § 724.012(b)
to mean "a usable specimen." 


Deputy Anders

 Appellee was involved in a head-on automobile collision. The time of the collision is unclear. The
state's first witness, Leo Anders, a Harris County Deputy Sheriff and accident investigator, testified that
he was dispatched to the scene at about 5:00 p.m. (1) Two cars were involved, with one driver, Ms. Perez,
pinned inside her car. The other driver, appellee, was lying a ditch by the side of the road. Before Anders
could talk to appellee, another driver, Sergio Parroquin "confronted" Anders. Parroquin told Anders that
he had been driving ahead of Perez; appellee veered into his lane, he swerved to avoid her, and appellee
then continued to drive partially in the oncoming lane and hit Perez. Parroquin saw the collision in his
rearview mirror.

 Anders spoke with appellee long enough to establish her identity. Even though she was wearing
an oxygen mask at the time, he noticed a moderate odor of alcohol on her breath. Anders was unable to
form an opinion at the scene as to appellee's level of intoxication because her injuries prevented him from
administering sobriety tests. Appellee was taken to Memorial Hermann Hospital. At this time, Perez had
been pinned in the wreckage for more than 40 minutes and was in critical condition. She died at the scene.

 Anders contacted Deputies Arturo Marines and Lawrence Hernandez, two other accident
investigators, and asked them to go to the hospital and get a blood sample from appellee. He contacted
them a second time to inform them that Perez had died. 

 Anders also talked with Ashley Carranza, who was driving 300 yards behind Perez at the time of
the collision. Carranza told Anders that Perez had been driving erratically and crossed the center line a few
times, apparently in an effort to pass vehicles that were ahead of her. Physical evidence at the scene
indicated that Perez was in her own lane at the time of impact. Another deputy took Carranza's written
statement.

Deputy Marines

 Deputy Marines testified that, at 7:13 p.m., he was on his way to the scene when Anders called
him and asked him to go to the hospital to get a blood sample, voluntarily if possible. The request was
changed to a mandatory draw after Perez died. Marines found appellee in Trauma Room 3, lying on a
gurney and attended by two nurses, Nancy Lopez and Penny Pope. He detected a strong odor of alcohol
on appellee's breath. Marines read appellee the statutory warning, form DIC-24, which begins "[y]ou are
under arrest for . . . operating a motor vehicle . . . in a public place while intoxicated . . .," and requested
a voluntary blood sample. Appellee refused. She did not sign the refusal because both arms had been
broken in the collision. (2)

 Marines then filled out form THP-51, Statutory Authorization for Mandatory Blood Specimen. 
He was present when the nurses drew the first specimen at 8:35 p.m., 2 vials for the sheriff's office and
other vials for the hospital laboratory. He did not administer sobriety tests because appellee was being
treated and had two broken arms. She did, however, answer his questions appropriately.

 At about 9:15 p.m., one of the nurses told Marines that the first specimen had been rejected by the
hospital laboratory as "contaminated." Marines did not repeat his request for a voluntary sample or file out
a second THP-51, but instructed the nurses to do another draw. The second draw was done at 9:25 p.m.,
50 minutes after the first and at least two and a half hours after the collision. The same nurses took the
second specimen. 

Deputy Hernandez

 Deputy Hernandez testified that he was dispatched to the scene of a fatality collision, i.e., after
Perez died. Anders asked him to go to the hospital and assist Marines with getting a blood sample. He
talked briefly with appellee, who was lying on a gurney with an IV in her arm. He detected "an odor" of
alcohol on appellee's breath. While appellee was lying on the gurney, he performed a horizontal gaze
nystagmus test (HGN) and "found all six clues and vertical gaze nystagamus." He concluded that appellee
was intoxicated on alcohol and also concluded that she might have other intoxicants in her system because
of the vertical nystagmus. (3)

 Hernandez took the blood specimen and headed for the medical examiner's (ME) office. On the
way, Marines called him on his cell phone and told him that there was a problem with the specimen. 
Hernandez spoke with his lieutenant, then returned to the hospital and picked up the second specimen. He
then went to the ME's office and put both specimens, labeled 1 and 2, into a refrigerated lockbox.

 On cross-examination, Hernandez agreed that the standards for the administration of sobriety tests
are set by the National Highway Traffic and Safety Administration (NHTSA). He also agreed that those
standards require that, before performing an HGN, he was supposed to inquire about past or present head
injuries and current medications, both of which can affect an HGN. Faced with a subject who had just
been in a fatal collision and who was hooked up to an IV, he asked none of the required questions. He
also conceded that HGN standards specify a subject standing with arms at the sides and that appellee was
lying flat on a gurney; he administered an HGN anyway. He conceded that she followed his instructions,
indicating normal use of mental faculties.

Nurse Pope

 Nurse Penny Pope testified that she drew blood from appellee's left arm for the deputies and the
hospital laboratory at the same time. She stated that appellee had an IV in her left wrist that had been in
place when appellee arrived at the hospital, presumably inserted by the EMTs who transported appellee
from the scene of the collision. The vial for hospital tests were sent to the hospital laboratory, which
rejected it as "contaminated" and asked for another specimen. She repeated the draw, 50 minutes later
and using appellee's right arm, again drawing for the hospital and the deputies at the same time. She also
testified that, until after the second draw, appellee received no pain medication to her knowledge and that
this was the usual practice; pain killers can lower blood pressure that is already low because of trauma even
further and cause death.

 For the purposes of the suppression hearing, the trial court admitted hospital laboratory results for
the second draw only.

Danielson, ME's office

 Terry Danielson, a toxicologist in the ME's office, testified that both specimens were tested using
gas chromatography. When questioned by the state about dilution of blood with saline, he testified that he
had seen, in the literature, an example in which a man was given two liters of saline and "it resulted in a 4
percent dilution." He opined that he would not be able to distinguish between such diluted blood and
undiluted blood. (4) 


Dr. Lykissa

 Appellee called Ernest Lykissa, the scientific director of ExperTox Laboratories in Houston. He
testified that he holds both Ph.D. and M.D. degrees, teaches at Baylor College of Medicine, and works
with law enforcement and state and federal agencies on toxicology issues and protocols. Before the hearing,
he had reviewed appellee's medical records in regard to her injuries from the collision except for the EMS
records.

 He agreed with Pope that saline and lactate are given to trauma patients to hydrate them and make
up for blood volume lost to bleeding. He explained that the hospital laboratory rejected the first draw
because elevated levels of sodium, potassium, and glucose-levels that "were not consistent with human
life"-indicated contamination.

 Lykissa testified at length about homeostasis-equilibrium-in a human body. He opined that
introducing saline would disrupt homeostasis for about two hours after the IV was removed, but that
homeostasis could be delayed beyond that time by concurrent stressors, such as bleeding and active
trauma.

 With regard to blood-alcohol levels, Lykissa noted that alcohol has a high affinity for water. As
a result, alcohol that has been absorbed by tissue, and that would normally remain there for a period of time
during burn-off, migrates into the preferred water/salt solution being pumped into the body via the IV. This
raises the alcohol level in the blood/saline mixture beyond what it would be if the body were uninjured and
in homeostasis. 

 In appellee's case, she had been receiving saline since about 7:00 p.m. She continued to receive
saline in the 50 minutes between draws and, at the same time. she continued to bleed internally from tears
in her colon. Lykissa testified that he believed that the second draw was also "contaminated" because of
the continued IV saline and the concurrent and continuing effects of her injuries.

 Lykissa also testified that he was certified to administer HGN, which he uses to look for head
injuries in trauma patients. He stated that, according to NHTSA standards, a valid test requires a standing
subject.

 Questioning by the state clarified that hospital laboratories and law-enforcement laboratories use
laboratory tests in different ways and for different purposes. For hospitals, a degree of inaccuracy is an
acceptable trade-off for rapid results that enable timely treatment. The opposite is true for law-enforcement
laboratories; they have little time pressure and a greater need for a higher degree of accuracy. (5)

 The trial court also briefly questioned Lykissa for clarification on the migration of alcohol from tissue
to saline. Lykissa's final answer on redirect examination was that when a foreign substance, in this case
saline, is mixed into blood, the integrity of the blood specimen is compromised and "you cannot have a valid
specimen." In his opinion, both specimens were compromised.

Argument

 Appellee argued to the trial court that it was an issue of admissibility, not weight. Neither side
contested that the first draw was invalid-the hospital laboratory had said so. But, "just because the second
one might not be as bad as the first one, it is still compromised . . .," by the additional 50 minutes of saline
drip.

 The state argued that it was an issue of weight, not admissibility; the jury should be the fact finder.

 The trial court ruled on appellee's suppression motion pursuant to Rule 702 and found that the first
draw was not reliable and suppressed it, but allowed the second draw. It then addressed appellee's motion
to suppress pursuant to § 724.012(b). The state argued that the second draw was merely a continuation
of the first. The trial court found that one "stick" is one specimen; a second "stick" is a separate specimen. 
It then granted appellee's motion to suppress the second draw, impliedly holding that "a" means "one." The
trial court also stated that, whatever it did, the decision would be appealed and that it would leave another
interpretation to "a higher authority."

Discussion

 One issue here is requiring that the specimen be "usable." The question is: usable by whom and
for what purpose? The only penal context of "usable" that I am aware of is "a usable quantity" of
marijuana. The definition of "usable" in Health and Safety Code § 481.121 is easily discerned; if it's
enough to smoke, it's usable. What is "usable' to a hospital laboratory for a quick-and-dirty, time-critical
scan may not be "usable" at the level of accuracy necessary for proof beyond a reasonable doubt. Which
"usable" do we use?

 A second issue is that we are to use the plain language of the statute in making our rulings. Boykin
v. State, 818 S.W.2d 782 (Tex. Crim. App.1991). Presumably, the legislature recognized the difference
between "a" and "one or more" and the markedly different level of invasiveness between a voluntary blood
specimen and an forcible one. "A" is not ambiguous. To say that the legislature, recognizing those
differences, intentionally selected those terms for the two subsections does not produce an absurd result,
nor can we say that it produces a result that the legislature could not possibly have intended. If it was an
oversight or a mistake, the legislature is free to amend § 724.012(b). Until then, we are bound by "a."

 The decision of the court of appeals should be affirmed. Because the Court does not do so, I
respectfully dissent.


Filed: November 7, 2007

Publish
1. Other deputies reported being sent to the scene at about 7:00 p.m.
2. Appellee's injuries included two broken arms, a broken leg, a broken collar bone, damage to her colon,
intestines, and liver, and internal bleeding.
3. Hospital laboratory reports indicate cocaine and marijuana.
4. There was testimony that appellee was receiving .25 liter of saline per hour. Assuming that the collision
occurred around 7:00 p.m., appellee had received about .375 liters in the 1½ hours preceding the first draw and about
.625 liters by the time of the second draw. Both are far smaller than the 2 liters cited by Danielson, yet the blood-alcohol results derived by the ME's laboratory doubled from the first sample (.08) to the second (.16).
5. Even so, Danielson testified that plus or minus 5% is an acceptable margin of error in the ME's laboratory.